MICHIGAN MUTUAL INSURANCE COMPANY v DEPARTMENT OF
CONSUMER & INDUSTRY SERVICES DIRECTOR

Docket No. 214395. Submitted April 5, 2000, at Lansing. Decided June 1,
2001, at 9:00 A.M.

Michigan Mutual Insurance Company and Michigan Worker's Compen-
sation Insurance Facility brought an action in the Ingham Circuit
Court against the director of the Department of Consumer and
Industry Services, the Commissioner of Insurance, and the Insur-
ance Bureau, seeking a declaration that the transfer of Insurance
Bureau hearing referees to the Office of Legal Services, Depart-
ment of Consumer and Industry Services, and the transfer of super-
visory authority over the hearing referees from the Commissioner
of Insurance to the director of the Department of Consumer and
Industry Services violated the Executive Organization Act, MCL
16.101 *et seq.* The plaintiffs, who at the time of their action were
also respondents to a petition filed by an insured seeking contested
case proceedings in the Insurance Bureau regarding the recalcula-
tion of the insured's premium for worker's compensation insurance,
also sought injunctive relief barring hearing referees who were not
designated, authorized, and supervised by the Commissioner of
Insurance from presiding over administrative hearings involving the
Insurance Code. The court, Thomas L. Brown, J., granted summary
disposition for the defendants. The plaintiffs appealed.

The Court of Appeals *held*:

1. The trial court erred in granting summary disposition for the
defendants with regard to the plaintiffs' declaratory judgment
action. Questions of fact exist concerning whether the transfer of
hearing referees from the Insurance Bureau under the Commis-
sioner of Insurance to the Office of Legal Services, Department of
Consumer and Industry Services, under that department's director
impairs the commissioner's ability to exercise statutory powers,
duties, and functions of adjudication independently of the director
of the Department of Consumer and Industry Services. The Insur-
ance Bureau and the Office of the Commissioner of Insurance were
transferred to the Department of Commerce (now part of the
Department of Consumer and Industry Services) by means of a
type I transfer under the Executive Organization Act, MCL

16.103(a). Pursuant to MCL 16.103(a), when an agency is transferred to a principal department by means of a type I transfer, the agency shall exercise its prescribed statutory powers, duties, and functions, including those of adjudication, independently of the head of the department to which the agency is transferred. In this case, the memorandum of understanding between the Commissioner of Insurance and the director of the Office of Legal Services that effectuated the transfer of the hearing referees gives rise to factual questions concerning whether the commissioner retained the independent ability to exercise statutory powers, duties, and functions of adjudication.

2. The trial court did not err in refusing to grant injunctive relief. Although the plaintiffs demonstrated a likelihood that they would prevail on the merits of their claim, they have nonetheless failed to demonstrate irreparable injury if injunctive relief was not granted. As the trial court properly noted, the plaintiffs may appeal any adverse ruling by the hearing referee presiding over their contested case.

Reversed and remanded.

STATE — EXECUTIVE BRANCH — EXECUTIVE ORGANIZATION ACT.

A board, commission, or other agency transferred intact to a principal department pursuant to a type I transfer under the Executive Organization Act shall exercise its prescribed statutory powers, duties, and functions of rule-making, licensing, and registration, including the prescription of rules, rates, regulations, and standards, and adjudication independently of the head of the department to which the board, commission, or agency is transferred (MCL 16.103[a]).

*Dykema Gossett PLLC* (by *Donald S. Young* and *Lori M. Silsbury*), for the plaintiffs.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Larry F. Brya*, Assistant Attorney General, for the defendants.

Amicus Curiae:

*Mika, Meyers, Beckett & Jones PLC* (by *Michael A. Zagaroli* and *Daniel C. Brubaker*), for Insurance Information Association of Michigan.

Before: WILDER, P.J., and McDONALD and DOCTOROFF, JJ.

WILDER, P.J. Plaintiffs appeal as of right from an order granting summary disposition to defendants pursuant to MCR 2.116(C)(10). We reverse and remand.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises out of the reassignment of the Insurance Bureau hearing referees to the Office of Legal Services (OLS), both of which agencies are part of the Department of Consumer and Industry Services (CIS). In 1965, the Legislature enacted the Executive Organization Act (EOA), MCL 16.101 *et seq.*, establishing nineteen principal departments of the executive branch of the state of Michigan's government. See MCL 16.104. After establishing the principal departments, the Legislature transferred various bureaus, boards, commissions, and agencies into one of the nineteen departments using three types of transfers: type I, type II, and type III. MCL 16.103.[1] In MCL 16.325, the Legislature created the Department of Commerce (now part of the CIS), and in MCL 16.329 the Department of Insurance (Insurance Bureau) and the Office of the Commissioner of Insurance were transferred to the Department of Commerce by a type I transfer. In addition, in passing the EOA, the Legislature specifically noted that "all powers, duties and

---

[1] Under a type I transfer, an agency is merely identified as being within a particular department, but the agency continues to perform its functions as prescribed by statute. Under a type II transfer, the agency loses autonomous control of its functions to the principal department. Under a type III transfer, the agency is abolished altogether.

functions vested in the office of governor are continued, except as otherwise provided" for in the EOA. MCL 16.110. One of these "powers" is the extensive authority the Governor has to reorganize the executive branch of the government as provided by Const 1963, art 5, § 2.[2] To this end, the EOA specifically provided the Governor with the power to reorganize the various components of the executive branch by executive order. MCL 16.134(2)[3]

Until 1997, the Insurance Bureau had a staff of three hearing referees who heard only contested cases involving the Michigan Insurance Code, MCL 500.100 *et seq.* These hearing referees reported to and were supervised by the commissioner. On October 4, 1997, Acting Commissioner Dominic D'Annunzio and the director of the OLS, Edward Rodgers, entered into a memorandum of understanding, effective immedi-

---

[2] Const 1963, art 5, § 2 states, in part:

Subsequent to the initial allocation, the governor may make changes in the organization of the executive branch or in the assignment of functions among its units . . . . Where these changes require the force of law, they shall be set forth in executive orders and submitted to the legislature. . . . Unless disapproved in both houses by a resolution concurred in by a majority of the members elected to and serving in each house, each order shall become effective at a date thereafter to be designated by the governor.

[3] MCL 16.134(2) provides, in part:

Whenever the governor makes changes in the organization of the executive branch or the assignment of the functions among its units which require the force of law, such changes shall be set forth in executive orders and copies of the orders shall be submitted to the legislature as provided in section 2 of article 5 of the state constitution. Unless disapproved in both houses by a resolution concurred in by a majority of the members elected to and serving in each house within the constitutional time period, such executive orders shall become effective at the date designated by the governor.

ately, transferring the three hearing referees formerly assigned to the Insurance Bureau to the OLS and providing that the hearing referees would thereafter be under the supervision of the CIS director. The memorandum of understanding further provided that the commissioner would authorize all hearing referees in the OLS to hear contested cases involving insurance disputes pursuant to § 212 of the Insurance Code, MCL 500.212. Pursuant to the memorandum, the OLS would provide the commissioner with a monthly status report indicating dates on which hearings had been held, recent filings and any scheduled hearing dates, hearing referees would adhere to the commissioner's interpretation of the Insurance Code and rules, and hearing referees would be precluded from dismissing cases and would only recommend dismissal, sanctions, or remedies depending on their findings and conclusions. Also on October 4, 1997, the acting commissioner signed a designation of authority appointing the twelve hearing referees at the OLS to conduct contested case hearings pursuant to § 212 of the Insurance Code, MCL 500.212, and the Administrative Procedures Act (APA), MCL 24.201 *et seq.*

Plaintiff Michigan Mutual Insurance Company sells worker's compensation insurance and other types of insurance to employers in the state of Michigan. Plaintiff Michigan Worker's Compensation Insurance Facility is a statutorily created nonprofit association of worker's compensation insurers that provides insurance in the involuntary market to employers who would not otherwise be able to get coverage. Under the name Amerisure, Michigan Mutual sells insurance in the involuntary market on behalf of the facility to high risk employers, including nonparty

Precision Steel Shearing. The rates used for employers serviced by the facility are based on the number of past worker's compensation claims filed by the employer and the nature of the work performed. Precision Steel Shearing requested a recalculation of the rates it was charged by Amerisure, naming both Michigan Mutual and the facility as respondents. Precision Steel Shearing petitioned for a contested case proceeding before the commissioner pursuant to the administrative rules of the Insurance Bureau. Hearing referee James Karpen of the OLS was assigned to hear the matter. Karpen was not one of the three hearing referees transferred from the Insurance Bureau to the OLS, but was one of the twelve hearing referees originally assigned to the OLS. Plaintiffs answered Precision Steel Shearing's petition for a contested case, denying the allegations that the insurance premium was not calculated correctly and challenging the jurisdiction of the tribunal on the basis that the assignment of hearing referee Karpen to this case violated the EOA, the APA, and the Insurance Code.

Plaintiffs then filed the instant lawsuit in the circuit court, claiming that the transfer of hearing referees from the Insurance Bureau to the OLS in the CIS violated the EOA because it divested the commissioner of complete adjudicatory power over insurance proceedings and granted independent, adjudicatory power to the hearing referees contrary to the mandate of the statute. Plaintiffs sought a declaratory judgment stating that the transfer of the supervisory authority over the hearing referees violated the EOA, and also sought injunctive relief barring hearing referees who were not designated, authorized, and supervised by the

commissioner from hearing administrative matters regarding the Insurance Code.

Defendants filed a motion for summary disposition pursuant to MCR 2.116(C)(4) and (10), arguing that the circuit court lacked jurisdiction over the matter because plaintiffs failed to exhaust their administrative remedies before filing suit and because more than fourteen days had elapsed between the time hearing referee Karpen was assigned to the matter and the date plaintiffs filed this action. Defendants also argued that injunctive relief was inappropriate because plaintiffs did not demonstrate that they would suffer irreparable harm or allege that they were likely to prevail on the merits of their claim.

The trial court granted defendants' motion for summary disposition, stating first, without elaboration, that it "retain[ed] jurisdiction" over the matter. The trial court then ruled that plaintiffs were not entitled to injunctive relief because they had not established that they were likely to prevail on the merits or would suffer irreparable harm. The trial court reasoned:

> In this case, the Memorandum of Understanding states that the Commissioner retains the power to select and appoint an ALJ where a statute requires an ALJ that is not a civil service employee. Moreover, the memorandum provides that OLS supply the Commissioner of Insurance with a monthly status report on hearings, filings, and other activity. It is clearly noted that ALJ will continue to adhere to interpretations of the Insurance Code and previous rulings of the Commissioner; ALJs will not dismiss cases and, dependent on their findings, ALJs will only make recommendations as to the appropriate disposal of cases—the Commissioner retains the final authority.
>
> In light of the Memorandum of Understanding, this Court finds that the transfer of the ALJs is within the purview of

the Executive Organization Act. As such, Plaintiffs fail to demonstrate that they are likely to prevail on the merits.

The Court now turns to the issue of irreparable harm. It is apparent that absent an adverse finding by the ALJ in its contested case proceeding, Plaintiff [sic] will be unable to demonstrate irreparable harm. Further, Plaintiff [sic] may appeal an adverse decision by the ALJ. Thus, Plaintiff [sic] has not demonstrated that the transfer of the ALJs will result in irreparable harm to their contested case.

Accordingly, the trial court granted summary disposition to defendants. Plaintiffs appealed.

## II. STANDARD OF REVIEW

We review a trial court's grant of summary disposition de novo. *Spiek v Dep't of Transportation,* 456 Mich 331, 337; 572 NW2d 201 (1998). Summary disposition pursuant to MCR 2.116(C)(10) tests whether there is factual support for a claim and is reviewed to determine whether the affidavits, pleadings, depositions, or any other documentary evidence establish a genuine issue of material fact to warrant a trial. *Id.*

Statutory interpretation is a question of law that is reviewed de novo. *Oakland Co Bd of Co Rd Comm'rs v Michigan Property & Casualty Guaranty Ass'n,* 456 Mich 590, 610; 575 NW2d 751 (1998).

## III. DISCUSSION

In this appeal, we are asked to decide whether defendants violated the EOA by divesting the commissioner of certain adjudicative functions through an internal departmental reorganization (i.e., a memorandum of understanding) rather than through an executive order from the Governor. We conclude that the trial court erred in granting summary disposition to

defendants on plaintiffs' claim for a declaratory judgment because questions of fact exist regarding whether the ability of the commissioner to adjudicate independently of the CIS director has been maintained with the transfer of hearing referees from the Insurance Bureau to the OLS.

Initially, we note that on February 3, 2000, Governor John Engler issued Executive Order No. 2000-4, effective April 3, 2000, which abolished the Insurance Bureau and the Commissioner of Insurance, and created the Office of Financial and Insurance Services (OFIS) as a type I agency within the CIS. The new OFIS shall be headed by a Commissioner of Financial and Insurance Services who shall be appointed by the Governor. By a type III transfer, the executive order transferred all the authority, powers, duties, functions, and responsibilities of the Commissioner of Insurance and the Insurance Bureau to the Commissioner of the OFIS and the OFIS, respectively. Because the newly created OFIS is a type I agency, it is required to exercise all powers and functions independently of the head of the CIS. Therefore, although the agency required to exercise the adjudicative functions at issue in this case has changed by virtue of the executive order and the issue raised in this case is unlikely to appear in future cases, because the alleged violation of the EOA created by the memorandum of understanding was a pertinent issue at the time, we will nonetheless consider plaintiffs' claims.

### A. EXECUTIVE ORGANIZATION ACT

Plaintiffs claim that the trial court erred in granting defendants' motion for summary disposition under MCR 2.116(C)(10) because the type I transfer of the

Insurance Bureau and the office of commissioner to the CIS, and the corresponding transfer of supervision of hearing referees within the Insurance Bureau from the commissioner to the OLS in the CIS, violated the EOA. According to plaintiffs, the transfer by a memorandum of understanding rather than by executive order directly violated the EOA because it effectively removed many of the commissioner's functions, including the power to adjudicate insurance matters independently of the head of the department.

As noted above, pursuant to Const 1963, art 5, § 2, the Governor has extensive authority to reorganize the executive branch of government. *House Speaker v Governor*, 443 Mich 560, 587; 506 NW2d 190 (1993). Indeed, art 5, § 2 "enables the Governor to enact laws affecting the executive branch, just as the Legislature can" by issuing executive orders and submitting them to the Legislature. *House Speaker, supra* at 578-579. In the absence of a legislative veto, the Governor's executive orders make changes in the organization of the executive branch or in the assignment of functions to various departments in order to ensure efficient administration. *Straus v Governor*, 459 Mich 526, 534; 592 NW2d 53 (1999); *Soap & Detergent Ass'n v Natural Resources Comm*, 415 Mich 728, 743; 330 NW2d 346 (1982). See also Const 1963, art 5, § 2 and MCL 16.134. The Governor's power includes the authority to delegate, assign, or transfer existing power, responsibility, or authority within, among, or across the principal departments and is limited only by constitutional provisions that would inhibit the Legislature itself. *Straus, supra* at 534.

The EOA was enacted to allow the Governor to reshape the executive branch of government. *Straus, supra; Soap & Detergent, supra* at 742-743. See also

Const 1963, art 5, § 2; MCL 16.110 and 16.134. The EOA empowers the Governor to transfer an existing department, board, commission, or agency to another principal department and it designates three classifications for such transfers:

(a) Under this act, a type I transfer means the transferring intact of an existing department, board, commission or agency to a principal department established by this act. When any board, commission, or other agency is transferred to a principal department under a type I transfer, that board, commission or agency shall be administered under the supervision of that principal department. Any board, commission or other agency granted a type I transfer shall exercise its prescribed statutory powers, duties and functions of rule-making, licensing and registration including the prescription of rules, rates, regulations and standards, and adjudication independently of the head of the department. Under a type I transfer all budgeting, procurement and related management functions of any transferred board, agency or commission shall be performed under the direction and supervision of the head of the principal department.

(b) Under this act, a type II transfer means transferring of an existing department, board, commission or agency to a principal department established by this act. Any department, board, commission or agency assigned to a type II transfer under this act shall have all its statutory authority, powers, duties and functions, records, personnel, property, unexpended balances of appropriations, allocations or other funds, including the functions of budgeting and procurement, transferred to that principal department.

(c) Under this act, a type III transfer means the abolishing of an existing department, board, commission, or agency and all its statutory authority, powers, duties, functions, records, personnel, property, unexpended balances of appropriations, allocations or other funds, are transferred to that principal department as specified under this act.

(d) Any department, board, commission or agency not enumerated within this act, but established by law within a

department, board, commission or agency shall continue within the department, board, commission or agency within which it had previously been established, and shall continue to exercise all its powers, duties and functions within the principal department established by this act. [MCL 16.103.]

Under subsection a, the transferred board, office, commission, or agency is given some area of independent authority and the statutory powers and functions, including adjudication, shall be exercised independently of the department head and without interference of supervision by the head of the department to which it was transferred. *Soap & Detergent, supra* at 749. See also OAG, 1965-1966, No 4479, p 212, 215 (March 9, 1966). However, although substantive functions vested by law in an agency or officer shall not be removed from that agency or officer, MCL 16.107(a),[4] under a type I transfer, the transferred body is subject to having its policies defined and its functions administered under the supervision of the principal department head in order to promote economy and efficiency. *Soap & Detergent, supra* at 749. In contrast, a department, board, commission, or agency reassigned to a principal department by a type II transfer loses its autonomous control over its functions. *Id.* at 748-749. Moreover, type III transfers abolish existing boards or commissions and reassign their

---

[4] MCL 16.107(a) provides:

Except as provided by law or within this act, the head of each principal department with the approval of the governor is authorized to establish the internal organization of his department and allocate and reallocate duties and functions to promote economic and efficient administration and operation of the department. No substantive function vested by law in any officer or agency within the principal department shall be removed from the jurisdiction of such officer or agency under the provisions of this section.

functions to a principal department. MCL 16.103(c); *Soap & Detergent, supra* at 749.

Our research has not revealed any case law interpreting the transfer provisions of the EOA as they relate to hearing referees and adjudication of contested cases. We note, however, that where the plain and ordinary meaning of language used by the Legislature is clear, judicial construction is neither necessary nor permitted. *Lorencz v Ford Motor Co*, 439 Mich 370, 376; 483 NW2d 844 (1992); *Heinz v Chicago Rd Investment Co*, 216 Mich App 289, 295; 549 NW2d 47 (1996). Here, use of the term "shall" in subsection a of the statute governing transfers, MCL 16.103(a), indicates mandatory rather than discretionary action, *In re Hall-Smith*, 222 Mich App 470, 472; 564 NW2d 156 (1997), and illustrates the Legislature's clear intent that all the commissioner's adjudicatory powers remain intact following the type I transfer of the department to the CIS. Indeed, had the Legislature intended to confer discretionary power to the CIS director to divest the commissioner of adjudicative powers over contested cases, it would have expressly stated so in the statute. Alternatively, the Legislature could have made the transfer of the office of the commissioner and Insurance Bureau to the CIS a type II or type III transfer, permitting the CIS to assume the commissioner's powers and functions. However, the Legislature did not do so and we must therefore enforce the statute as written.

After reviewing the record, we find that plaintiffs have introduced sufficient evidence to create a factual dispute regarding whether, pursuant to the memorandum of understanding, effective October 4, 1997, ultimate supervisory authority over the hearing refer-

ees and their cases rested with the OLS and the CIS director or the commissioner. Affidavits submitted by the parties in support of and in opposition to defendants' motion for summary disposition reveal conflicting interpretations of the commissioner's supervisory role over hearing referees after the transfer. An affidavit submitted by Kathleen Wilbur, the director of CIS, stated that she would not allow the adjudicatory independence of the commissioner to be affected by the transfer. However, despite her "promise" not to "attempt to control, restrict, modify or limit what any designated [hearing referee] does in any contested case under the Commissioner's jurisdiction," Wilbur's affidavit does not dispute that the CIS director and the OLS have the *ability* and *power* to interfere with this independence if they desired, contrary to the express mandate in the EOA that the commissioner retain all substantive adjudicative functions vested by law for a type I transfer. MCL 16.107(a). See MCL 500.210; 1993 AACS, R 500.2135 (one of the commissioner's statutory duties is the adjudication of contested insurance cases). Additionally, Joseph Olson, a former Commissioner of Insurance, stated in his affidavit that before the transfer of hearing referees to the OLS, the hearing referees assigned to the Insurance Bureau reported to him and he had exclusive power to evaluate the hearing referees and monitor their case loads. Olson noted, however, that when hearing referees from the Bureau of Occupational and Professional Regulation (BOPR) were briefly assigned to hear Insurance Bureau proceedings, the BOPR hearing referees would often ignore his instructions regarding the handling of cases and enter default judgments against parties despite his orders that they had no authority to do so. Olson

stated that because the BOPR hearing referees did not report to the commissioner, he had no supervisory authority over hearing referees from other bureaus, and he was unable to take effective action to prevent them from acting contrary to his directions.

Further, the record shows that under the system in effect after the transfer, the OLS, not the commissioner, assigns hearing referees to contested cases and issues notices of hearing. Further, the OLS is required to assign hearing referees with insurance experience *only when requested* and, then, selection of the particular hearing referee rests with the OLS unless a statute requires a hearing referee who is not a civil service employee, in which case the commissioner will select and appoint the hearing referee. It is undisputed that before October 1997, the commissioner appointed hearing referees with considerable experience in interpreting the Insurance Code and ruling on insurance issues to contested cases. In other words, under the posttransfer scheme, the hearing referees' employment is supervised entirely by the director of the OLS, designated by the director of the CIS, not the commissioner as required by the Insurance Code, MCL 500.212(3), and the APA, MCL 24.279 (Commissioner of Insurance is authorized to designate the persons who will serve as presiding officers in contested cases over which the commissioner has authority).

The trial court found that, in light of the provisions in the memorandum of understanding, the commissioner would retain final authority over contested cases and, thus, the transfer of hearing referees was within the purview of the EOA. However, a thorough review of the record reveals that the trial court's con-

clusion does not fully recognize the transfer's effect on the commissioner's supervisory role over hearing referees. Indeed, following the reorganization, the commissioner no longer sets hearing referee salaries, evaluates their work, retains disciplinary authority over them, or selects the particular hearing referee to hear a case. In short, the commissioner's ability to exercise complete independent authority over the hearing referees, without interference from the OLS or CIS director, is impaired. The EOA expressly requires that, under a type I transfer, "prescribed statutory powers, duties and functions of . . . adjudication" must be exercised independently of the head of the department. We find that by transferring ultimate supervisory authority over hearing referees from the commissioner to the director of the CIS, and reserving only the final decision for the commissioner through the memorandum of understanding under the guise of "administrative efficiency," factual questions exist regarding whether defendants have usurped the commissioner's authority over several critical stages of the administrative hearing process, contrary to the mandates of the EOA.

For these reasons, we conclude that questions of fact exist concerning whether the transfer of hearing referees from the Insurance Bureau under the commissioner to the OLS in the CIS pursuant to the memorandum of understanding impairs the commissioner's ability to adjudicate administrative contested cases independently of the CIS director—or whether the commissioner's substantive adjudicative functions have been impermissibly removed. Accordingly, the trial court erred in granting summary disposition

under MCR 2.116(C)(10) to defendants with regard to plaintiffs' declaratory judgment action.

### B. INJUNCTIVE RELIEF

With respect to plaintiffs' claim for injunctive relief, we find that the trial court did not err in refusing to grant an injunction. Although we conclude from our analysis above that plaintiffs demonstrated a likelihood that they would prevail on the merits of their claim, plaintiffs nonetheless failed to demonstrate irreparable injury if injunctive relief was not granted. See *Michigan Coalition of State Employee Unions v Civil Service Comm*, 236 Mich App 96, 102; 600 NW2d 362 (1999), citing *AFL-CIO v Secretary of State*, 230 Mich App 1, 14; 583 NW2d 701 (1998). As the trial court properly noted, plaintiffs may appeal any adverse ruling of the hearing referee.[5]

Reversed and remanded. We do not retain jurisdiction.

---

[5] Plaintiffs also argue that the trial court erred in applying the standards for injunctive relief when deciding their request for a declaratory ruling. In view of our decision to reverse the trial court's order granting summary disposition to defendants, we need not address this issue.